IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2015

**STATE OF TENNESSEE v. DARRYL L. BRYANT**

**Appeal from the Criminal Court for Sullivan County**
**No. S61,966     Robert H. Montgomery, Jr., Judge**

---

**No. E2014-01323-CCA-R3-CD – Filed July 17, 2015**

---

The Defendant, Darryl L. Bryant, was indicted for one count of possession of oxycodone with intent to sell or deliver, a Class C felony; and one count of simple possession of marijuana. See Tenn. Code Ann. §§ 39-17-417, -418. Following a jury trial, the Defendant was convicted of the lesser-included offense of facilitation of possession of oxycodone with intent to sell, a Class D felony; and acquitted of the simple possession charge. See Tenn. Code Ann. §§ 39-11-403, -17-417. The trial court sentenced the Defendant to six years as a Range II, multiple offender. In this appeal as of right, the Defendant contends (1) that the trial court erred in denying the Defendant's motion to suppress the evidence against him; (2) that the trial court erred in denying the Defendant's request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); (3) that the evidence was insufficient to sustain his conviction for facilitation of possession of oxycodone with intent to sell; (4) that the trial court erred in instructing the jury; and (5) that the State committed prosecutorial misconduct.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Darryl L. Bryant, Whiteville, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Barry Staubus, District Attorney General; and Kent L. Chitwood, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

---

[1] For the purpose of clarity, we have reordered the issues as stated by the Defendant in his brief.

## FACTUAL BACKGROUND

At the suppression hearing, Detective Nathan Elliot of the Kingsport Police Department (KPD) testified that on November 7, 2012, he received a tip from a confidential informant (CI) named "Rachel." Det. Elliot testified that he believed that the CI was a reliable informant because she had been used in twelve previous controlled purchases. Det. Elliot further testified that the CI had given him information on three prior occasions that had led to the issuance of search warrants, subsequent arrests and "recovery of narcotics." According to Det. Elliot, on those three occasions, he found narcotics where the CI said they would be located. Det. Elliot admitted that the CI had convictions for simple possession of marijuana and possession of drug paraphernalia, associated with "known criminals," and was paid for the information she provided in this case.

Det. Elliot testified that the CI told him that at approximately 10:00 a.m., there would be a black Lexis in the parking lot of the West Side Inn with two people inside. The CI told Det. Elliot that one of them would be Winfred Byrd, Jr., the co-defendant in this case, and that Mr. Byrd "would be in possession of more than 100 [o]xycodone pills." Det. Elliot testified that he believed the CI's information was based on her personal knowledge. However, Det. Elliot admitted that the CI did not say that she had personally observed the pills. Instead, Det. Elliot testified that the CI "had stated that Mr. Byrd was somebody [she] had met recently who was dealing a lot of narcotics in Kingsport." Det. Elliot admitted that the CI provided no information about the Defendant.

Based upon the CI's information, Det. Elliot and another detective went to the West Side Inn in an unmarked minivan. Det. Elliot testified that once they arrived at the West Side Inn, they saw a black Lexis in the parking lot with two men inside. According to Det. Elliot, the car was alone in the middle of the parking lot. Det. Elliot drove by the car and saw Mr. Byrd in the passenger's seat. Det. Elliot testified that he recognized Mr. Byrd from "past narcotics investigations" and that he had "dealt with [Mr. Byrd] many times" when he was a jailer. Det. Elliot further testified that he knew Mr. Byrd was a convicted drug dealer. However, Det. Elliot admitted that it had been four or five years since he had last seen Mr. Byrd. Det. Elliot further admitted that there was nothing suspicious about the car and that the Defendant and Mr. Byrd were just sitting in the car when he drove by.

Det. Elliot testified that after he drove by the Lexis, he parked about fifty to sixty feet away and called the CI to ask her to describe the car again and "to ascertain if [she] had any more new information." The CI told Det. Elliot that she had just spoken to Mr. Byrd and he told her "that they were there." Det. Elliot admitted that he did not see Mr.

Byrd using a phone when he drove by the car. Det. Elliot testified that after speaking to the CI on the phone, he initiated a "felony stop in the parking lot." According to Det. Elliot, he pulled the van up behind the driver's side of the Lexis and a marked patrol car pulled up behind the passenger's side. Det. Elliot testified that he drew his weapon, pointed the gun at the car, and ordered the men out of the car. Det. Elliot further testified that as the Defendant was exiting the car, he saw "something fly in the air, several small pills in the air when the vehicle door opened."

Det. Elliot testified that he handcuffed the Defendant and advised him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). According to Det. Elliot, he asked the Defendant what he was doing at the parking lot, and the Defendant answered, "We came here to meet some girl named Rachel to sell some pills." Det. Elliot testified that he then asked the Defendant why there were "pills scattered over the car" and that the Defendant answered, "When you all pulled up [Mr.] Byrd threw them inside the car." Det. Elliot further testified that he asked the Defendant how many pills were in the car and the Defendant answered, "Probably 100." According to Det. Elliot, the Defendant also admitted that the car was his.

Det. Elliot testified that in the driver's seat, there was "a small clear plastic bottle that had [twenty] pills" inside it. Det. Elliot further testified that there were more pills "scattered throughout the vehicle in the cup holder and the floorboard areas." In total, Det. Elliot found eighty-eight pills scattered throughout the car in addition to the twenty inside the plastic bottle. Det. Elliot testified that he found also "a very small amount of marijuana" in the trunk of the car and two cell phones inside the car. Det. Elliot testified that he found $600 on the Defendant when he searched him. According to Det. Elliot, the parking lot for the West Side Inn was an area with a "significant amount of drug activity" at that time. At the conclusion of the suppression hearing, the trial court denied the Defendant's motion, finding that the CI was reliable and had personal knowledge of the information she provided to Det. Elliot.

At trial, Detective Noah Tidwell of the KPD testified that on November 7, 2012, he was a patrolman and was asked to assist Det. Elliot in an investigation. Det. Elliot instructed Det. Tidwell to park his patrol car behind the West Side Inn so it would not be seen. Det. Tidwell testified that the area where the West Side Inn was located was "a high crime area." Det. Elliot then radioed Det. Tidwell and informed him that the car he was looking for was in the parking lot. Det. Tidwell pulled up behind "a dark colored Lexis" with a Knox County license plate and two people inside. Det. Tidwell testified that as he approached the passenger's side door he saw "through the back glass . . . just kind of pills go flying everywhere." Det. Tidwell testified that he got the passenger out and "just secured" him while Det. Elliot dealt with the Defendant.

Det. Elliot's testimony at trial was consistent with his testimony from the suppression hearing. Det. Elliot testified that the CI specifically told him that there would be two black men in the car. Det. Elliot also estimated that the "street value" of the pills was over $3,000. Det. Elliot testified that Mr. Byrd had no money on him when he was arrested, but that the Defendant had $600 in $100 bills. Det. Elliot admitted that "the most common denomination [of] currency found on drug dealers . . . would be normally [twenty dollar bills]." Det. Elliot further testified that he knew Mr. Byrd also went by the alias Michael Byrd.

Michael Bleakley testified that he was a special agent and forensic scientist for the Tennessee Bureau of Investigation (TBI). Agent Bleakley was admitted as an expert in narcotics identification. Agent Bleakley testified that he examined the pills and plant material recovered from the Defendant's car. Agent Bleakley concluded that the 108 pills found in the car were oxycodone and that the plant material found in the trunk of the car was marijuana residue. Agent Bleakley explained that at the TBI laboratory, residue was considered "anything weighing less than .03 grams."

Mr. Byrd testified on the Defendant's behalf at trial. Mr. Byrd admitted that he went by both Michael Byrd and Winfred Byrd, Jr. Mr. Byrd testified that he met the Defendant while they were both in prison. Mr. Byrd claimed that on November 7, 2012, he learned that his brother had died and that the Defendant picked him up to take him to the bus station so he could go to his brother's funeral. Mr. Byrd also claimed that the Defendant gave him $100 for a bus ticket. Mr. Byrd testified that once he was in the Defendant's car, he asked the Defendant to take him to the West Side Inn parking lot "to pick up some money from this girl that owed [him] some money." Mr. Byrd testified that the Defendant was impatient and did not want to wait for the woman because he needed to get to work.

Mr. Byrd admitted that he pled guilty in this case and that he was there to "meet Rachel to sell her some pills." Mr. Byrd also admitted that he threw the pills in the car as the police approached them. Mr. Byrd testified that he could not remember how many times he spoke to the CI on the phone that day, but admitted that he had met her "[m]ultiple times." Mr. Byrd denied that the Defendant knew anything about his plan to sell the pills to the CI. Mr. Byrd admitted that he had a prior conviction for cocaine possession and that he was "sure" the Defendant knew why he was in prison. Mr. Byrd further admitted that he testified at his guilty plea submission hearing that the Defendant's answers to Det. Elliot's questions were truthful. However, Mr. Byrd testified that he did not hear Det. Elliot question the Defendant, claimed that "a lot" of the guilty plea submission hearing was not transcribed, and claimed that he did not understand the prosecutor's questions at the hearing.

-4-

The Defendant testified that he met Mr. Byrd while they were both in prison. The Defendant explained that he spent eighteen years in prison for aggravated robbery and especially aggravated robbery convictions before he was paroled. The Defendant admitted that he knew Mr. Byrd was in prison for being a "drug dealer." The Defendant testified that once he and Mr. Byrd had both been released from prison, he "tried to help" Mr. Byrd. According to the Defendant, on November 7, 2012, he received a phone call from Mr. Byrd's aunt informing him that Mr. Byrd's brother had died. The Defendant testified that she asked him to call Mr. Byrd and tell Mr. Byrd about his brother. The Defendant claimed that he then called Mr. Byrd, told Mr. Byrd about his brother, and that Mr. Byrd said he had no way to get back home for the funeral.

The Defendant testified that he offered to buy Mr. Byrd a bus ticket and drive him to the bus station in Knoxville. The Defendant claimed that he drove to Kingsport to pick up Mr. Byrd and that he left his home in Knoxville with the television on and the coffee "running" because he was "coming straight back." The Defendant explained that he had to be at work to open the convenience store he worked at. The Defendant admitted that he was arrested with Mr. Byrd in Kingsport around 10:00 a.m., but claimed that the convenience store he worked at did not open until noon. The Defendant testified that he picked Mr. Byrd up at "his brother's house" in Kingsport and that Mr. Byrd put his bag in the trunk of the car before he got in the car.

The Defendant testified that as Mr. Byrd was getting in the car, he noticed that Mr. Byrd had a blunt of marijuana in his hand. The Defendant claimed that he told Mr. Byrd to get rid of it and that Mr. Byrd "faked like he [threw] it away." According to the Defendant, he and Mr. Byrd were on their "way back to Knoxville" when Mr. Byrd asked him to stop at the West Side Inn so Mr. Byrd could "pick up money from a girl." The Defendant testified that the woman was supposed to already be in the parking lot, but Mr. Byrd was texting her and said she was "pulling in." The Defendant stated that he parked the car and left it running, but that he was upset and worried that he was going to be late for work.

The Defendant recalled seeing a van drive by his car and park "a few cars down." The Defendant testified that "a few minutes later [he] look[ed] up and there [was] a gun pointed right at [him]." The Defendant claimed that he did not hear any commands from the police officers, but that when he saw the gun and Det. Elliot's badge, he "immediately open[ed] the door," put his hands up, and said, "Please do not shoot me." The Defendant claimed that Det. Elliot never questioned him and that a different police officer asked him if the pills in the car were his. The Defendant testified that he told the police officers that he did not know where the pills had come from and denied knowing that Mr. Byrd planned to sell the pills to the CI.

-5-

The Defendant claimed that he had $600 on him the day of his arrest because he was planning on paying off his car loan. The Defendant testified that there were three cell phones in his car that day. The Defendant admitted that all three of the phones belonged to him, but claimed that he gave a phone to Mr. Byrd. The Defendant further claimed that he "never used [the] phone" Mr. Byrd used to call the CI and arrange the sale of the oxycodone pills. On cross-examination, the Defendant claimed, contrary to his previous testimony, that Det. Elliot actually did speak to him at the scene of the arrest and asked him how many pills were in the car and to whom the car belonged.

Based upon the foregoing, the jury acquitted the Defendant of the charged offense of possession of oxycodone with intent to sell and convicted him of the lesser-included offense of facilitation of possession of oxycodone with intent to sell. The jury also acquitted the Defendant of the simple possession of marijuana charge. Following a sentencing hearing, the trial court sentenced the Defendant to six years' incarceration as a Range II, multiple offender. The trial court ordered the Defendant's sentence to be served consecutively with the remainder of the sentence from which the Defendant had been released on parole when this offense was committed. The Defendant filed a timely motion for new trial and several amendments in which he raised the claims brought on appeal as well as ineffective assistance of counsel. The trial court denied the motion, including the Defendant's claim of ineffective assistance of counsel. The Defendant now appeals.

## ANALYSIS

### I. Suppression Motion

The Defendant contends that the trial court erred in denying his suppression motion. The Defendant argues that Det. Elliot lacked the requisite probable cause to seize Mr. Byrd and himself because the CI did not provide Det. Elliot with any information to suggest she had personal knowledge of what she told Det. Elliot about Mr. Byrd and the oxycodone pills. The State does not respond to the Defendant's argument regarding the CI's basis of knowledge. Rather, the State argues that "the officers had probable cause to arrest the [D]efendant when they found contraband in his car in the process of arresting his passenger."

On appellate review of a suppression issue, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the

trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. A trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted).

"[W]hen the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Here, the officers approached the car with their guns pointed at the car and ordered the Defendant and Mr. Byrd out of the car. Therefore, the seizure of the Defendant and Mr. Byrd occurred before Mr. Byrd threw the oxycodone pills into plain view. As such, and contrary to the State's argument on appeal, our analysis turns on whether the CI's tip and Det. Elliot's confirmation of the CI's information constituted probable cause for the warrantless arrest of the Defendant and Mr. Byrd.

A police officer may arrest a person without a warrant when the officer has probable cause to believe that the person has "committed or was in the process of committing a felony." State v. Tays, 836 S.W.2d 596, 598 (Tenn. Crim. App. 1992) (citing Draper v. United States, 358 U.S. 307 (1959)); see also Tenn. Code Ann. § 40-7-103(a)(3)-(4) (stating that a police officer may conduct a warrantless arrest of a person when "a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony" and on "a charge made, upon reasonable cause, of the commission of a felony by the person arrested").

To establish whether probable cause existed to make the warrantless arrests of the Defendant and Mr. Byrd, the State must satisfy the two-prong test established in Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969). See

State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989) (holding that the Aguilar-Spinelli test is "the standard by which probable cause will be measured to see if the issuance of a search warrant is proper under" the Tennessee Constitution); Tays, 836 S.W.2d at 599-600 (holding that the Aguilar-Spinelli test is applied to determine the validity of a warrantless arrest). Probable cause requires that there be a basis for the informant's knowledge, and that the informant must be credible or her information reliable. Jacumin, 778 S.W.2d at 436.

The evidence adduced at the suppression hearing established that Det. Elliot had worked with the CI on several controlled narcotics purchases and that she had provided information on three prior occasions that had resulted in the issuance of search warrants and subsequent arrests. Det. Elliot further testified that on those three prior occasions, he located narcotics where the CI had said they would be. Therefore, the CI's credibility and reliability were established at the suppression hearing. With respect to the CI's basis of knowledge, Det. Elliot testified that the CI did not say she had personally observed Mr. Byrd with the pills, but that she "had stated that Mr. Byrd was somebody [she] had met recently who was dealing a lot of narcotics in Kingsport." This fact was corroborated by Mr. Byrd when he testified at trial that he had met the CI multiple times. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that appellate courts "may consider the proof adduced both at the suppression hearing and at trial" in evaluating a trial court's ruling on a pretrial motion to suppress).

The CI's knowledge of Mr. Byrd and his status as a drug dealer coupled with Det. Elliot finding the Defendant and Mr. Byrd, whom he knew to be a convicted drug dealer, at the appointed location and time and in a car matching the CI's description was sufficient to satisfy the basis of knowledge prong of the Aguilar-Spinelli test. See Tays, 836 S.W.2d at 600 (concluding that basis of knowledge prong was satisfied where informant told police officer that he had met with the defendant and learned that the defendant "could supply large amounts of" narcotics, and the defendant arrived in Nashville from the city and on the night "predicted by the informant"); see also State v. Brown, 898 S.W.2d 749, 752 (Tenn. Crim. App. 1994) (concluding that any doubts about the informant's veracity were "erased when the [defendant] came to the prearranged spot for the drug transaction at the exact time [the informant] had requested" which "perfectly corroborated" the informant's statements). Accordingly, we conclude that the trial court did not err in denying the Defendant's suppression motion.

## II. *Franks* Hearing

The Defendant contends that the trial court erred in denying his request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The Defendant alleges that there were numerous instances where Det. Elliot lied during his testimony at the suppression hearing and that the trial court should have held a pre-trial hearing to address

his allegations.  The State has failed to respond to the Defendant's argument with respect to this issue.

In Franks, the United States Supreme Court held that the Fourth Amendment requires that a defendant be provided an evidentiary hearing to challenge a facially valid search warrant when the defendant has made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  438 U.S. at 155-56.  However, the defendant's challenge "must be more than conclusory" and "must be accompanied by an offer of proof."  Id. at 171.  As such, "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." Id.

The Defendant was not entitled to a Franks hearing because "there was no search warrant to challenge."  State v. Dock Battles, No. 02C01-9212-CR-00294, 1996 WL 551786, at *5 (Tenn. Crim. App. Sept. 30, 1996), perm. app. denied (Tenn. Jan. 27, 1997).  Furthermore, the Defendant's allegations were merely conclusory and not accompanied by an offer of proof.  Additionally, the Defendant did not file his motion for a Franks hearing until after the suppression hearing.  At the suppression hearing, the Defendant had the opportunity to raise the issues complained of in his motion and to cross-examine Det. Elliot about the alleged inconsistencies in his testimony. Accordingly, we conclude that this issue is devoid of merit.

*III. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his conviction for facilitation of possession of oxycodone with intent to sell.  Chiefly, the Defendant argues that both he and Mr. Byrd testified that he did not know about the pills or that Mr. Byrd planned to sell the pills to the CI.  Therefore, the Defendant argues that, he could not have knowingly assisted Mr. Byrd in the offense.  The Defendant also argues that Det. Elliot was "repeatedly inconsistent" and lied during his trial testimony. The State responds that the evidence was sufficient to support the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984);

State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). The facilitation statute applies to a person who provides substantial assistance in the commission of a felony, but

-10-

who does so "without an intent to promote, assist in, or benefit from the commission of the felony." State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001).

Here, the Defendant drove from Knoxville to Kingsport to pick up Mr. Byrd, who the Defendant knew to be a convicted drug dealer. The Defendant then drove Mr. Byrd to the location where Mr. Byrd had agreed to meet the CI at the arranged time. Mr. Byrd admitted at trial that he knew the CI and was at the West Side Inn parking lot, a location known as a high crime area, that day to sell oxycodone pills to the CI. The Defendant also provided Mr. Byrd with the cell phone he used to communicate with the CI. After his arrest, police found over 100 oxycodone pills in the Defendant's car. The Defendant had a large sum of money on his person while Mr. Byrd had none. Det. Elliot testified that the Defendant admitted to him that he and Mr. Byrd were there "to meet some girl named Rachel to sell some pills."

This evidence was sufficient to establish that the Defendant knowingly furnished substantial assistance to Mr. Byrd in the commission of a felony. With respect to the Defendant's argument that Det. Elliot was "repeatedly inconsistent" and lied during his trial testimony, the Defendant thoroughly cross-examined Det. Elliot about the alleged inconsistencies and lies. Det. Elliot's credibility was a question for the jury, which we will not revisit on appeal. Likewise, the jury's rejection of the Defendant and Mr. Byrd's testimony that the Defendant was unaware of Mr. Byrd's plan to sell the oxycodone pills involved questions of witness credibility, conflicts in testimony, and the weight and value to be given to evidence, which were the sole province of the jury as the trier of fact. We will not revisit those determinations on appeal. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for facilitation of possession of oxycodone with intent to sell.

### IV. Jury Instructions

#### A. Facilitation Instruction

The Defendant contends that the trial court erred by instructing the jury on facilitation as a lesser-included offense. The Defendant argues that the evidence adduced at trial did not support an instruction on facilitation. The State responds that the evidence at trial warranted the instruction.

Tennessee Code Annotated section 40-18-110(d) provides, in the pertinent part, that "[i]f the defendant fails to object to a lesser included offense instruction, the inclusion of the lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on appeal." The Defendant was provided with the trial court's proposed jury instructions, which included the facilitation instruction, and did not object to those instructions. The Defendant did not object when the trial court

read the facilitation instruction to the jury. Accordingly, the Defendant has waived our consideration of this issue by his failure to object to the inclusion of the instruction at trial.

## *B. Criminal Responsibility Instruction*

The Defendant contends that the trial court erred in instructing the jury on criminal responsibility for the conduct of another. The Defendant argues that the instruction was "not supported by the proof." The Defendant further argues that its placement before the expert witness instruction gave "it more weight," as well as confused and misled the jury. The State failed to respond to the Defendant's argument with respect to this issue.

"A person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2). The trial court instructed the jury as such. Criminal responsibility is not a separate crime, but rather, "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). "A charge of criminal responsibility is appropriate if it is fairly raised by the evidence." State v. Gene Shelton Rucker, Jr., No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *6 (Tenn. Crim. App. Dec. 9, 2004), perm. app. denied (Tenn. Mar. 21, 2005).

Here, the instruction was warranted given Det. Elliot's testimony that the Defendant said that he and Mr. Byrd were there to "to meet some girl named Rachel to sell some pills." Additionally, the evidence at trial established that the Defendant drove Mr. Byrd to the arranged meeting place at the appointed time, that he provided Mr. Byrd with the cell phone used to contact the CI, and that the Defendant was in possession of a large amount of cash while Mr. Byrd had no money on him.

With respect to the Defendant's claim that the instruction's placement before the expert witness instruction gave "it more weight," the trial court instructed the jury that the "order in which these instructions are given is no indication of their relative importance." A jury is presumed to follow the instructions of the trial court. See State v. Banks, 271 S.W.3d 90, 134 (Tenn. 2008).

Furthermore, any error with respect to the criminal responsibility instruction would ultimately be harmless as the jury rejected the theory of criminal responsibility by acquitting the Defendant of the charged offenses; therefore, it did not affect the verdicts or result in prejudice to the judicial process. See Tenn. R. App. P. 36(b). Accordingly, we conclude that this issue is without merit.

-12-

## C. Inaccurate Statements of the Law

The Defendant contends that the trial court's instruction on facilitation was an inaccurate statement of the law because it did not state that the Defendant had "to be found guilty of <u>all</u>" the essential elements and that it should have combined the second and third elements into one element. The Defendant also contends that the trial court's definition of "knowing" was "confusing and improper." The State has failed to respond to these contentions.

With respect to facilitation, the trial court instructed the jury as follows:

For you to find the [D]efendant guilty of facilitation of any offense the State must have proven beyond a reasonable doubt <u>the existence of the following essential elements</u>:

(1) the [D]efendant knew that another person intended to commit the specified offense but did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or the results of the offense; <u>and</u>

(2) that the [D]efendant furnished substantial assistance to that person in the commission of the specified offense; <u>and</u>

(3) that the [D]efendant furnished such assistance knowingly.

(Emphasis added).

While the instruction did not use the word "all," it is clear from the instruction that the jury had to find all three elements beyond a reasonable doubt. With respect to the Defendant's argument that the second and third elements should have been combined, we note that this instruction was taken from Tennessee Criminal Pattern Jury Instructions 3.02 and is an accurate statement of the law. As such, the Defendant's argument is without merit.

The trial court provided the jury with the following definition of "knowingly":

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when a person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

-13-

The trial court's definition specifically tracked the language of the statutory definition of "knowing" found in Tennessee Code Annotated section 39-11-302(b) and was not misleading or confusing. See State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994) (holding that the term "knowing" is "commonly used by the general population" and "understood by persons of ordinary intelligence"). Accordingly, we conclude that this issue has no merit.

## V. Prosecutorial Misconduct

### A. *Brady* Violations

The Defendant contends that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Chiefly, the Defendant complains that the State withheld "court documents, police records, and cell phones that would have corroborated his trial defense." The State responds that the Defendant "has shown no suppression of exculpatory evidence."

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, the State is not required to disclose "information that the accused already possesses or is able to obtain, or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted). Likewise, the State "is under no obligation to make an investigation, or to gather evidence, for the defendant." State v. Brownell, 696 S.W.2d 362, 363 (Tenn. Crim. App. 1985).

The Defendant's argument with respect to this issue is somewhat vague, but it appears that his main complaints are that he never received Mr. Byrd's criminal history or the cell phones seized from his car on the day of his arrest. With respect to Mr. Byrd's criminal history, our supreme court has held that the State "has no duty, either under the Tennessee Rules of Criminal Procedure or by decisional law in this state to provide [the arrest histories of the State's witnesses] to the defendant." State v. Workman, 667 S.W.2d 44, 51 (Tenn. 1984). Here, Mr. Byrd was not a witness for the State, but rather testified on the Defendant's behalf. As Mr. Byrd was the Defendant's own witness, he should have been able to obtain Mr. Byrd's criminal history from him. With respect to the cell phones, they were in police custody, but it does not appear from the record that the Defendant ever attempted to subpoena the items or properly admit them into evidence at trial. Accordingly, we conclude that this issue is devoid of merit.

-14-

*B. Closing Argument*

The Defendant contends that the State intentionally misstated the evidence on several occasions during its closing arguments. The State has again failed to respond to this contention.

Closing arguments "have special importance in the adversarial process" and the parties "have an ancient right to make closing arguments." Banks, 271 S.W.3d at 130. Closing arguments allow the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. Attorneys "should be given great latitude in both the style and the substance of their arguments." Id. at 131. This leeway often results in closing arguments in criminal cases having a "rough and tumble quality" to them. Id. (quoting State v. Skakel, 888 A.2d 985, 1060-61 (Conn. 2006)). However, while attorneys "may strike hard blows, . . . [they are] not at liberty to strike foul ones." Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

"[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131. Prosecutors "may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." Id. (emphasis added) (internal citations omitted). This court has found five general areas of prosecutorial misconduct with respect to closing arguments, the only one of which is at issue in this case is that it "is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. In reviewing the propriety of a prosecutor's closing argument, this court considers:

> (1) the conduct at issue in light of the facts and circumstances of the case,
> (2) the curative measures undertaken by the trial court and the prosecution,
> (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

Id.

The Defendant argues that the prosecutor intentionally misstated the evidence when discussing the cell phone the Defendant provided to Mr. Byrd. The Defendant points to the following excerpt from the State's closing argument:

> [Mr. Byrd was] using the [D]efendant's phone that the [D]efendant never uses and you heard his testimony, "I never use that phone. I've got three phones, I never use that one, the one I gave to Mr. Byrd to call this person to arrange this drug deal. I don't want my voice on that phone. I don't want my text on that phone. I never used that phone that I gave to Mr. Byrd to call this individual to arrange this drug deal." Okay, this again is not disputed.

The Defendant did not object to this statement.

Later, in arguing that the Defendant could be found guilty under a theory of criminal responsibility, the prosecutor stated as follows:

> How likely is it that [the Defendant] with his connections, he met Mr. Byrd in prison, knows he's a drug dealer. Mr. Byrd gets out [of prison]. "Hey, why don't you come hang around with me. Why don't I give you a ride. Why don't you use my phone. I'm never going to touch the drugs. I'm never going to talk on the phone. You do your thing over there. I'll drive you around. I'll let you use the phone."

The Defendant objected to the prosecutor's statement, and the trial court overruled the objection.

It was undisputed that the Defendant provided Mr. Byrd the cell phone used to communicate with the CI. The Defendant also testified that he never used the phone that he provided to Mr. Byrd. The Defendant did not testify that he provided the phone to Mr. Byrd for the purpose of setting up a drug deal. However, given the evidence introduced at trial, this was a reasonable inference that could be drawn from that evidence. Likewise, the prosecutor's inference that the Defendant did not use the phone because he did not want to leave any evidence of his participation in the drug deal could be reasonably inferred from the evidence adduced at trial. Accordingly, we conclude that the prosecutor's statements in this regard were not intentional misstatements of the evidence.

The Defendant further argues that multiple other statements made by the prosecutor during his closing arguments were intentional misstatements of the evidence. Specifically, the Defendant points to statements by the prosecutor that Mr. Byrd agreed during his plea submission hearing that what the Defendant said to Det. Elliot on the day

of their arrest was the truth and that Mr. Byrd did not come forward until the trial to claim that the Defendant did not know about the drug deal. However, the Defendant failed to object to these statements. Failure to object to the State's alleged misconduct during closing argument waives the issue on appeal. See Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Furthermore, the prosecutor's statements about Mr. Byrd's testimony at his plea submission hearing were factually accurate. Mr. Byrd testified at trial that he told his attorney that the Defendant was not involved in the plan to sell oxycodone pills to the CI, but, despite this, the prosecutor's statements that Mr. Byrd had not brought this to the attention of the police or prosecutors until trial were factually accurate. Accordingly, we conclude that this issue is without merit.

*C. Presenting False Testimony*

The Defendant contends that the State knowingly presented false testimony by allowing Det. Elliot to testify at trial. The Defendant argues that Det. Elliot lied during his testimony on several occasions. The Defendant alleges that Det. Elliot could not have known who Mr. Byrd was because Mr. Byrd sometimes went by an alias. The Defendant also alleges that Det. Elliot's description of how he investigated the CI's information defies "common sense." The Defendant further alleges that Det. Elliot's description of seeing the pills being thrown by Mr. Byrd was "mathematically impossible." The State has once more failed to respond to these arguments.

The State "may not present false testimony and . . . it has an affirmative duty to correct false testimony presented by State's witnesses." State v. Cureton, 38 S.W.3d 64, 74 (Tenn. Crim. App. 2000). "To obtain a new trial, the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material." Id. at 74-75. Having reviewed Det. Elliot's testimony, we conclude that there is nothing in the record to suggest that his testimony was false or that the State knowingly presented false testimony. Accordingly, this issue has no merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-17-